# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 16-1356V**
**Filed: July 20, 2018**
PUBLISHED

| | |
|---|---|
| DEBRA JOHNSON,<br><br>                   Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>                  Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barré Syndrome<br>(GBS) |

*Verne E. Paradie, Jr., Paradie, Sherman, et al., Lewiston, ME,* for petitioner.
*Ryan Daniel Pyles, U.S. Department of Justice, Washington, DC,* for respondent.

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On October 18, 2016, Debra Johnson ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered to her on November 16, 2015. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

On September 22, 2017, respondent filed his Rule 4(c) report in which he states that he does not contest that petitioner is entitled to compensation in this case. Respondent's Rule 4(c) Report at 1. Specifically, respondent states "the evidence shows that petitioner more likely than not suffered GBS following the administration of a

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

seasonal flu vaccine, and that the onset occurred within the time period specified in the Table.  Recognizing that petitioner may re-file this petition and be afforded a presumption of causation under the revised Table, respondent will not contest entitlement in this case."  *Id.* at 3.  For the reasons set forth below, the undersigned finds that $180,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering and emotional distress.

## I.    Procedural History

Ms. Johnson filed her petition for compensation along with three sets of medical records on October 18, 2016.  (ECF No. 1.)  She filed three additional exhibits and a Statement of Completion on December 15, 2016.  (ECF No. 9, 11.)  On January 5, 2017, respondent filed a status report stating that he was amenable to negotiating a potential settlement of the case and requested the that initial status conference be suspended to allow the parties time to attempt to resolve the case.  Respondent's Status Report dated Jan. 1, 2017, (ECF No. 12).  This request was granted and the parties were ordered to file periodic status reports updating the Court on the status of their discussions.  *See* Scheduling Order dated Jan. 5. 2017, (ECF No. 13).

On June 12, 2017, petitioner filed a status report stating that the parties were "unable to reach resolution of this matter through negotiations" and requested a status conference.  Status Report dated June 12, 2017, (ECF No. 22).  To identify issues for resolution and to obtain respondent's formal position on the case, the undersigned issued an order for respondent to file his report pursuant to Vaccine Rule 4(c).

On September 21, 2017, respondent filed the Rule 4(c) report stating that he does not contest entitlement in this matter.  Respondent's Report at 1 (ECF No. 30).  Respondent noted that the Qualifications and Aids to Interpretation ("QAI") of the newly revised Vaccine Injury Table require that a person claiming that a flu vaccination caused GBS establish the "presence of '[b]ilateral flaccid limb weakness.'  In the current case, sensory deficits were petitioner's primary symptomatology, and she does not appear to have had flaccid limb weakness.  Nonetheless, in DICP's judgment, the record does not support a diagnosis alternative to GBS by preponderant evidence."  *Id.* at 2-3.  Respondent also noted that the evidence demonstrated that petitioner "more likely than not suffered GBS following the administration of a seasonal flu vaccine, and that the onset occurred within the time period specific in the [Vaccine Injury] Table."  *Id.* at 3.  Recognizing that petitioner may re-file her petition and be afforded a presumption of causation under the revised Table (*see* 42. U.S.C. §300aa-16(b)), respondent stated that he would not contest entitlement to compensation in this case.  *Id.*  A ruling on entitlement finding in petitioner's favor and a damages order were issued on September 22, 2017 and October 30, 2017, respectively.  (ECF Nos. 31-32).

On November 18, 2017, respondent filed a status report stating the parties were still at an impasse over the appropriate amount of compensation to be awarded in this case, particularly the appropriate amount to be awarded as compensation for petitioner's pain, suffering and emotional distress.  Respondent's Status Report dated Nov. 18, 2017 (ECF No. 33).  The staff attorney managing this case held a status conference with the parties on December 12, 2017, to discuss the next steps for resolving damages.  As a result of that status conference, a damages hearing was set for January 31, 2018.  Prehearing Order dated Jan. 18, 2018 (ECF No. 34).  The parties

filed their respective prehearing submissions from January 18 to January 29, 2018. (ECF Nos. 35-38).

The damages hearing was held as scheduled in Washington, D.C., on January 31, 2018. Ms. Johnson was the sole witness and she testified in person. During the hearing, the undersigned identified a number of additional records that were necessary for resolution of the damages in this case and ordered petitioner to file those records by March 2, 2018. On March 14, 2018, petitioner filed the final set of records in this case. (ECF No. 46). The damages phase of this case is now ready for adjudication.

## II.    Factual History

Ms. Johnson was born on August 22, 1954. Petition ("Pet.") at 1, ¶1. She currently resides in Kingfield, Maine with her husband and works as a school bus driver for the local school district and as a part-time school librarian. Transcript ("Tr.") at 5-7. Her medical history includes a number of issues including breast cancer, hypertension, and back pain, but none of these issues appear to be contributory to her condition in this case. Petitioner's Exhibit ("Pet. Ex.") 1 at 2-14; Pet. Ex 4; Pet. Ex. 5.

Ms. Johnson testified that because she worked in a school (Pre-K to 8th grade) and was in daily contact with children, the school's nurse highly encouraged Ms. Johnson to receive an annual flu vaccination. Tr. at 10-11. On November 16, 2015, Ms. Johnson saw her primary provider, Dr. Jean Antonucci, for complaints of a scratchy throat and cough. Pet. Ex. 1 at 15-18; Tr. at 11. She was assessed with an upper respiratory infection and was prescribed Tylenol with codeine. Pet. Ex. 1 at 18. During this visit, Ms. Johnson also received a flu vaccine. *Id.* The next day, on November 17, 2015, Dr. Antonucci called Ms. Johnson to follow up. *Id.* The medical records note that Ms. Johnson said she was feeling a bit better and that the codeine was helping her cough when she took it, but that it made her feel drowsy. *Id.*

On December 10, 2015 (approximately 23 days later), Ms. Johnson called Dr. Antonucci asking to be seen because of a strange feeling of numbness in her hands and feet. Pet. Ex. 1 at 18. Ms. Johnson testified that on the morning of December 10, 2015, she was walking across the parking lot of the school to begin her bus duties and she had a strange sensation in her feet, as if she had forgotten to put her shoes on. Tr. at 12. After she completed her bus run, Ms. Johnson stated that the feeling in her feet worsened and it felt as if her feet "were swollen, full, fat." Tr. at 12. Ms. Johnson arranged for another driver to complete her afternoon bus run and went home to call her doctor. *Id.*

Ms. Johnson testified that she was able to schedule an appointment with Dr. Antonucci for 4:15PM that same day, but that she called her Dr. Antonucci's office back shortly thereafter, complaining that the numbness had worsened and progressed. The numbness had now spread to her buttocks and she complained that her legs were also feeling heavy. Pet. Ex. 1 at 18; Tr. at 12-13. Dr. Antonucci suspected Ms. Johnson may have GBS and urged her to go to the emergency room as soon as possible. Pet. Ex. 1 at 18.

Ms. Johnson arrived at the emergency room at Franklin Memorial Hospital later that afternoon with her husband. Pet. Ex. 3 at 310. The emergency room ("ER") notes include a chief complaint of numbness and decreased sensation to Ms. Johnson's bilateral legs (left worse than right), left arm worse than right, and to bilateral buttocks. *Id.* It was noted that Ms. Johnson had received a flu shot three weeks prior. Pet. Ex. 3 at 312. While at Franklin Memorial Hospital, Ms. Johnson underwent a lumbar puncture. *Id.* at 314-15; 321; 327. In the hospital notes addendum, it is noted that Ms. Johnson had complained of decreased sensation in her lower extremities which was ascending. *Id.* at 330. The onset of her condition was described as abrupt. *Id.* When Ms. Johnson's shoulders and arms also became symptomatic, it was decided that she would be transferred to Central Maine Medical Center ("CMMC") for a suspicion of possible GBS. Pet. Ex. 3 at 342, 356; Tr. at 14.

Ms. Johnson was transferred to CMMC and was hospitalized from December 10 to December 15, 2015. Pet. Ex. 2 at 43. Her primary diagnosis was GBS. *Id;* Tr. at 15. The result of her lumbar puncture revealed a slightly elevated protein level that was thought to be consistent with GBS (Pet. Ex. 2 at 43). Ms. Johnson received five days of IVIG while hospitalized. *Id.* Her condition improved, but upon discharge, she still had decreased sensation in her lower extremities, "more so than [in] her upper extremities." *Id.* at 46.

On December 15, 2015, Ms. Johnson was discharged from CMMC with a final diagnosis of GBS. Pet. Ex. 2 at 43. The discharge report noted that although Ms. Johnson underwent IVIG treatment for five days and her symptoms were improved, she had not returned to normal. *Id.* at 45. The discharge note stated that Ms. Johnson's recovery "may take longer and she may not recover completely overall." *Id.* Ms. Johnson testified that upon discharge, she could not walk on her own. Tr. at 18. She felt as if her legs were asleep and she could not discern when her feet where on the ground. *Id.*

On December 18, 2015, three days after her discharge from the hospital, Ms. Johnson presented to Dr. Antonucci in follow up. Pet. Ex. 1 at 20. Dr. Antonucci noted that Ms. Johnson was diagnosed with GBS and given IVIG treatment. *Id.* Ms. Johnson reported that she felt improved since first being admitted to the hospital, but that her legs felt "abnormal" and that she could not "tell for sure where she puts her feet down." *Id.* In the assessment, Dr. Antonucci noted that she had an extensive discussion with Ms. Johnson about her recovery and about when she could expect to return to work. *Id.* at 21. Dr. Antonucci noted her concern that Ms. Johnson may have central canal stenosis at the cervical and lumbar levels of her spine and would need to be seen by a neurosurgeon for an assessment. *Id.* at 20-21.

On December 23, 2015, Ms. Johnson was seen for her annual follow-up appointment for her bilateral knee replacement surgery which took place in 2012. Pet. Ex. 4 at 387. Ms. Johnson reported she still was experiencing numbness/tingling and an unsteady gait. *Id.* at 388. Upon examination, it was noted that Ms. Johnson had

decreased sensation in both lower extremities from her waist down related to her GBS. *Id.* at 387; 390.

Also on December 23, 2015, Ms. Johnson was seen in consultation at the Neurosurgery & Spine department of Maine Medical Partners.  Pet. Ex. 7 at 1.  In Dr. Hall's assessment, he stated that he suspected, given Ms. Johnsons' response to treatment for GBS, that the paresthesia in her legs was related to her GBS and not spinal stenosis.  *Id.*  He advised that Ms. Johnson avoid doing activities that would involve overhead lifting, heavy lifting and bending and encouraged her to maintain good core muscle strength.  *Id.*

On March 8, 2016, Ms. Johnson returned to Dr. Antonucci for a follow-up appointment.  Pet. Ex. 1 at 34.  Dr. Antonucci noted that Ms. Johnson was slowly progressing.  *Id.* at 36.  At the time of this appointment, Ms. Johnson was still not driving.  Ms. Johnson reported that she could now feel her thighs and the soles of her feet, but she had trouble assessing whether she needed to defecate or void.  *Id.*  Dr. Antonucci noted that Ms. Johnson walked with a slightly stiff-legged gait and that she had to use the wall to support her while she walked.  *Id.*  Dr. Antonucci also noted that Ms. Johnson declined the referral to neurology because Ms. Johnson "s[aw] no need to see neuro…"  *Id.*  Ms. Johnson inquired when she would be able to return to work as the school librarian.  *Id.*  Dr. Antonucci permitted Ms. Johnson to return to working at the school library for half a day twice a week and to follow up on her ability to work depending on how that trial period progressed.  *Id.*  Dr. Antonucci's return to work notice stated that Ms. Johnson would be permitted to return to work for not more than four hours a day, two days a week.  *Id.*  She noted that Ms. Johnson was able to sit indefinitely and stand unassisted for up to five minutes, but she could not walk unassisted; that she could walk with poles for 30 minutes maximum.  *Id.*  Dr. Antonucci also noted that Ms. Johnson could lift up to 10 pounds occasionally but that she "may experience unpredictable [and] significant fatigue."  *Id.*

By March 25, 2016, Dr. Antonucci approved Ms. Johnson to work half-days, up to three times per week.  Pet. Ex. 1 at 38.  On June 16, 2016, Ms. Johnson presented to Dr. Antonucci to discuss whether Ms. Johnson would be able to pass her school bus physical later that summer.  Pet. Ex. 1 at 39.  Ms. Johnson reported that she had begun to drive cautiously and that she had done well except that she still could not feel the bottom of her feet or her buttocks.  *Id.*  Ms. Johnson also reported that she was able to walk without her walking sticks but that she felt more secure with them.  Ms. Johnson stated that she was dismissed from physical therapy "as they had little to offer" and that she had to travel 25 to 30 miles away and was unable to get a ride to continue with her appointments.  Tr. at 34-35.  Ms. Johnson also stated that her balance and speed were slow.  *Id.*  Dr. Antonucci noted that Ms. Johnson's gait was normal, albeit "a little slow [and] a little imprecise" but she did not fall and was able to walk backwards.  *Id.* at 40. In her assessment, Dr. Antonucci stated that it was "unclear how much [Ms. Johnson would] improve" but that she thought Ms. Johnson would be able to drive the school bus for the upcoming school year.  Dr. Antonucci stated that she would put into a place a

"self-directed agility program" and that Ms. Johnson was to see occupational health at the end of July to assess her ability to return to work.  *Id.*

Ms. Johnson passed her physical examination in 2016 and returned as the school bus driver for the 2016-2017 school year.  Tr. at 25, 46.  She also returned part-time as the school librarian.  *Id.*

On August 18, 2017,[3] Ms. Johnson returned to Dr. Antonucci for her annual bus driver physical exam.  Pet. Ex. 8 at 441.  Ms. Johnson reported feeling dizzy often, so she stopped taking her blood pressure medication a few weeks prior.  *Id.*  Ms. Johnson also complained that she was easily fatigued from her GBS.  *Id.*  Dr. Antonucci cleared Ms. Johnson to drive the school bus and recommended that she restart her blood pressure medication at a lower dose.  *Id.* at 442.

Ms. Johnson next presented to Dr. Antonucci on September 25, 2017, complaining of exhaustion due to her GBS.  Pet. Ex. 8 at 439.  Ms. Johnson reported that she slept a lot and had slept 30 hours the past weekend.  *Id.*  In her assessment, Dr. Antonucci noted that Ms. Johnson was about 2-3 years out from her diagnosis of GBS.  Dr. Antonucci documents that fatigue is a well-known symptom of GBS and that the evidence-based treatment includes physical training.  *Id.* at 439.  She prescribed a trial of Savella.  *Id.*  Dr. Antonucci noted on October 9, 2017, that the trial of Savella failed due to its side effects.  *Id.* at 440.

Ms. Johnson filed as exhibit 10, a letter from her exercise therapist, John Winter of Winter's Health & Fitness, who stated that Ms. Johnson had been under his care from February 27, 2017 to February 26, 2018 for a total of 45 visits.  Pet. Ex. 10 at 1.  He states that in these visits, Ms. Johnson worked on mobility, flexibility, strength and conditioning and balance progressing.  *Id.*  He notes that "[s]he has made small but very important improvements with her GBS."  *Id.*

Currently, Ms. Johnson is suffering from the residual effects of her GBS.  She stated that it took her months after her discharge from the hospital to be able to walk on her own.  Tr. at 19.  Ms. Johnson stated that she bought a pair of Nordic walking sticks to help with her balance in the months and year following her discharge and she testified that she still keeps the walking sticks in her car in case she needs to use them.  Tr. at 19-20.  She explained that she and her family and dog used to hike together and she is no longer able to hike at all with her family.  Tr. at 21-22.

Ms. Johnson stated she was unable to drive a car for four months following her discharge from the hospital due to the numbness in her feet and legs.  Tr. at 23.  In the spring/summer of 2016, Ms. Johnson stated that she informally requested that Dr. Antonucci give her the annual physical test required for bus drivers, and it became apparent that she would not pass the test at that time.  *Id.*  Based on that initial test, Ms.

---

[3] No records have been filed for the time period from June 2016 to April 2017.  The records from May to August 2017 do not specifically mention any GBS symptoms.

Johnson stated that she was determined to work hard to be able to pass her physical in the fall.  *Id.* at 24.

Ms. Johnson testified that one of the most concerning residual symptoms of her GBS is that she is still unable to tell when she needs to use the bathroom.  Tr. at 27. Ms. Johnson testified that, to this day, she still needs to travel with spare clothing.  *Id.* She never had any similar symptoms prior to her vaccination.  Tr. at 28.

Ms. Johnson also testified that her fatigue due to the GBS is an ongoing problem. Tr. at 29.  She stated that before her GBS, she worked a ten-hour day, waking up at 4:30AM and arriving at the school at 6AM for her morning bus run.  Tr. at 43.  After her bus run, she would go to the school library and work as the librarian.  *Id.*  Around 2:30PM, Ms. Johnson would leave for her afternoon bus run and depending on the weather, would be finished between 3:30PM-4:00PM.  Tr. at 44.  Depending on the day and time of year, Ms. Johnson may have also proctored an ITV (interactive television) course after school, which may have been twice a week depending on the semester. Tr. at 44-45.  After having GBS, Ms. Johnson testified that she was unable to drive for the rest of the 2015-2016 semester.  Tr. at 46.   Because of the scarcity of bus drivers, Ms. Johnson eventually went back to driving the bus in the fall of 2016 Monday-Friday, but she had to cut back her hours at the library.  Tr. at 48.  Ms. Johnson no longer works as the school librarian on Mondays, and from Tuesday through Friday, she works from 8:30AM to11:30AM and from 1:30PM to 2:30PM.  Tr. at 48.  Because of her fatigue, she has to go home from 11:30AM to1:30PM to rest. Tr. at 48.  Ms. Johnson is no longer able to cover lunch duties for the teachers as she did prior to her vaccination. Tr. at 49.  She also testified that she goes to bed much earlier than she used to and takes three to four hour naps. Tr. at 26, 31.

Ms. Johnson states that she currently still has some residual numbness in her legs.  Tr. at 29.  She explained that "if somebody rubs their hand down my leg, yes, I can tell that they're doing that, but it's like they're through all my clothing and I have a snowmobile suit on or something… it's not the same sensation."  Tr. at 30.  She also testified that she is unable to tell when her feet are cold and she needs to be very careful, especially with the extremely cold temperatures during the winter, which can get as cold as 30 degrees below zero.  Tr. at 30.  Ms. Johnson stated that the numbness in her legs and feet "are what they are" and the sensation has not changed or improved. Tr. at 31.  She testified that she works with a personal trainer to help her with the balance and strength in her legs. Tr. at 31.

Ms. Johnson explained that her biggest fear is what lies ahead.  Tr. at 32.  She stated that last summer, she came down with a case of the shingles and because of her history of vaccine reactions, she is unable to receive a shingles vaccine.  *Id.*  Ms. Johnson stated that she cannot receive any vaccinations and she is concerned and worried about what may happen in the future if she becomes ill.  *Id.*  She testified that her husband should have already retired, but because Ms. Johnson is unable to work the hours she previously did and because she needs the health insurance, her husband has postponed his retirement.  Tr. at 52.

### III.    Contentions of the Parties

The parties have agreed that Ms. Johnson should be awarded compensation in the amount of $6,000 for both her vaccine-related unreimbursable expenses and lost earnings.  Joint Status Report, Jan. 18, 2018 (ECF No. 36).  Thus, the only disputed issue before the undersigned is the amount of damages to be awarded for Ms. Johnson's pain and suffering and emotional distress.

#### A. Petitioner's Position

Petitioner proposes a pain and suffering award of $250,000, the most allowed for pain and suffering cases in the Vaccine Program under the statutory cap.  Petitioner's Brief Regarding Damages ("Pet. Brief") at 4.  Petitioner explains that she experienced significant physical and emotional distress as a result of her GBS.  *Id.*  She states that she still suffers from the lingering effects of her fatigue and some loss of sensation in her feet.  *Id.* at 5.  Ms. Johnson also explains in her brief that she had to give up some of her positions in the school system and cut back on her hours at a job she truly enjoyed.  *Id.*  In her brief, petitioner also cites to a number of cases where stipulations and/or damage awards have been granted, with specified pain and suffering awards ranging from $150,000-$225,000.  *Id.* at 3-4.

#### B. Respondent's Position

Respondent proposes a pain and suffering award of $75,000 for past and the net present value of future pain, suffering and emotional distress.  Respondent's Prehearing Brief and Witness List (Res. Brief) at 13.  In his brief, respondent recognizes that GBS cases "have historically run the spectrum from cases involving severe sequelae requiring life care plans to assess prospective damages to cases in which the petitioner nearly or completely recovers shortly after the six month minimum duration of symptomatology required to qualify for compensation."  *Id.* at 11.  Respondent argues that Ms. Johnson's pain and suffering, comparatively speaking, is "a less severe course than most."  *Id.*

In support of this pain and suffering award, respondent notes that the Vaccine Injury Table contemplates that GBS includes the presence of "[b]ilateral flaccid limb weakness."  It appears in this case that Ms. Johnson did not have flaccid limb weakness and respondent also notes that petitioner was hospitalized for a limited duration of time from December 10-15, 2015, and required no inpatient rehabilitation.  Res. Brief at 12.  Respondent also notes that Ms. Johnson required no follow-up care from a neurologist for her GBS after hospitalization.  At the time respondent's brief was filed, it was unknown whether Ms. Johnson received physical or occupational therapy.  Finally, respondent notes that Ms. Johnson was not on any medications "that one could expect following a GBS diagnosis, such as gabapentin."  *Id.*  Ms. Johnson was cleared to return to work on a part-time basis on March 10, 2016, three months after the onset of her GBS.  *Id.*

Respondent notes that the "sealed nature of Vaccine Act cases makes true head-to-head comparison of this case to other difficult."  Res. Brief at 12.  Nonetheless,

respondent views Ms. Johnson's case as similar to two other case in which a lower amount of pain and suffering damages was awarded.  *See Frost v. Sec'y of Health & Human Servs.*, No. 16-1671, 2017 WL 4510357 (Fed. Cl. Spec. Mstr. Sept. 12, 2017) ($75,000 proffered and awarded) and *Nolt v. Sec'y of Health & Human Servs.*, No. 16-0842, 2017 WL 2888945 (Fed. Cl. Spec. Mstr. Jan.21, 2017) $75,000 awarded, although the case was resolved through stipulation).

## IV.    Discussion and Analysis

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), *originally issued* Apr. 19, 2013 ("*I.D.*") ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *See I.D.*, 2013 WL 2448125, at *9; *McAllister v. HHS,* No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995).

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125 at *9-11, *citing McAllister v. Sec'y of Health & Human Servs.*, No. 91-103V, 1993 WL 777030 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995). In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and hearing testimony.

### A. Determining Petitioner's Award in This Case

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving GBS.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute.  Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of her suffering.

### a. Severity of the Injury

Ms. Johnson was hospitalized for approximately five days for her GBS.  During this time, she received IVIG therapy which improved her symptoms, but she was left with residual symptoms that left her unable to drive and work for a considerable amount of time.  Ms. Johnson lives in a very rural area in Maine where, prior to her GBS, she was fully independent.  At the age of 60, she was working a minimum of 10 hours days in sometimes harsh weather conditions as a school bus driver, and also as a school librarian.  Tr. at 44-45.  She enjoyed hiking with her dog and family and spent much time outdoors.  Her life now as a result of the GBS has changed dramatically.

The affidavits and hearing testimony also establish that Ms. Johnson's pain and symptoms have interfered with her ability to work.[4]  She can no longer work the number of hours that she did as a school librarian and her ongoing fatigue has hindered her ability to proctor the ITV course after school.  Tr. at 47-49.  Ms. Johnson stated that she has to return home in the middle of the day to rest in order to complete her evening bus run and she can no longer handle the lunch duties for the other teachers at her school. Tr. at 48-49.

Regarding medication therapy, Ms. Johnson testified at the hearing that she did not seek out any additional care with her neurologist for medication therapy. Respondent specifically noted in his brief that Ms. Johnson was not on any medications "that one could expect following a GBS diagnosis, such as gabapentin."  Res. Brief at 11. That does not change the way her injury affected her life.  Ms. Johnson explained during her testimony that she initially did try taking some of the medications prescribed by her physician, such as Savella, but because of the side effects of these medications, she stopped taking them.  Tr. at 41.  Ms. Johnson testified that she does not want to live her life taking medications and if she "can get by" without the medications, then she preferred to do so.  Tr. at 54.  While Ms. Johnson could have taken medication, her fear of taking and being dependent on medication, as well as suffering the side effects of the medication, led to her decision not to continue seeking out medication therapy.  She should not be penalized for her decision.

Ms. Johnson's hospital course necessitated that she attend physical therapy to improve her ability to walk and regain the feeling in her legs.  She testified at the hearing that initially, a physical therapist travel to her home to conduct the sessions. After a number of at-home sessions, Ms. Johnson was transitioned to a physical therapist's office at Franklin Memorial Hospital.  Tr. at 36.  But because Ms. Johnson lives in a very rural area in Maine, and her physical therapist was located in Farmington, Maine, approximately 25-30 miles away, she needed transportation to her physical therapy sessions because she was unable to drive at the time.  Tr. at 35.  After a few sessions, Ms. Johnson felt that she was not showing any substantial improvement from her physical therapy, and she decided to discontinue her sessions and try a home

---

[4] Ms. Johnson's inability to work and her change in work hours as a result of her GBS symptoms are distinct issues that are separate and apart from her request for lost wages, which the parties have already resolved.

exercise program.  Tr. at 35.  She had a walker provided to her.  Tr. at 26.  Ms. Johnson also sought out the services of a personal trainer within her town named John Winters.  Tr. at 38-39.   Ms. Johnson filed a letter from Mr. Winters who confirmed that he was an exercise therapist and worked with Ms. Johnson for a total of 45 visits.  Pet. Ex. at 10.  Mr. Winters stated that "[i]n these sessions, we have worked on mobility, flexibility, strength and conditioning and lots of balance progressions.  She has made small but very important improvements with her GBS."  *Id.*

Ms. Johnson's testimony was very credible.  Following the hearing, she has convinced the undersigned that she was not suffering any less than another individual, but rather as a result of her circumstances, her location in a rural area of Maine, her fear of taking pain medications and her general outlook on life, Ms. Johnson simply managed her symptoms differently.  The undersigned finds Ms. Johnson's oral testimony credibly added additional information that is not available in her medical records.  Based upon this additional information, the undersigned has determined that Ms. Johnson's personality is of the type that she does not complain or she may not necessarily seek out medical attention unless the situation is serious enough to warrant it.  Other individuals in a similar circumstances as Ms. Johnson may have approached the treatment for GBS in a very different way.  This does not in any way negate the seriousness and severity of her injury.

### b.  Duration of the Suffering

In terms of duration, the undersigned notes that Ms. Johnson has been dealing with the residual symptoms of her GBS for nearly two and a half years.  Ms. Johnson testified that this injury has "totally changed [her] life."  Tr. at 52.  Ms. Johnson explained that she now experiences significantly increased fatigue which appears to be a permanent condition; there has been no obvious improvement in her fatigue levels.  Also, she has continued numbness in her legs and feet.  Essentially, her condition has plateaued and there is no evidence that her condition will improve.

Ms. Johnson testified that that an issue that she still has to deal with to this day is that she does not always know when she needs to use the bathroom.  Tr. at 27.  Ms. Johnson testified that she always has to travel with spare clothing because she's had incidents where she did not make it to the restroom on time and had to either purchase new clothing or she has to always carry spare clothing with her.  Tr. at 28.  This is not an issue she ever had to deal with prior to her vaccination and appears to be one that she will continue to have to endure.

Ms. Johnson also testified that she continues to deal with numbness in her legs from her knees down.  Tr. at 30.  She explained that "if somebody rubs their hand down my leg, yes, I can tell they're doing that, but it's like they're through all my clothing and I have a snowmobile suit on or something… it's not the same sensation."  *Id.* Living in such a rural area where hiking, taking her dog on long daily walks, and spending time in the outdoors is a norm, she is no longer able to participate in these activities.  Tr. at 21-

22. Again, there is no indication that there will be any improvement from these symptoms.

### B. Amount of the Award

For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $180,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering and emotional distress. In addition, the undersigned finds that petitioner is entitled to compensation for $6,000.00 for vaccine-related unreimbursable expenses and lost earnings.

### V.    Conclusion

In light of all of the above, the undersigned awards the following compensation:

**A lump sum payment of <u>$186,000.00</u>, (representing $180,000.00 for petitioner's actual pain and suffering and $6,000.00 for unreimbursable medical expenses and lost wages) in the form of a check payable to petitioner, <u>Debra Johnson</u>.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a). *Id.*

The clerk of the court is directed to enter judgment in accordance with this decision.[5]

**IT IS SO ORDERED.**

**<u>s/Nora Beth Dorsey</u>**
Nora Beth Dorsey
Chief Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.